**BOB'S BEVERAGE, INC., et al., Plaintiffs,**

v.

**ACME, INC., et al., Defendants.**

**No. 1:97CV650.**

United States District Court, N.D. Ohio, Eastern Division.

Jan. 29, 1999.

698

Charles P. Royer, Frank J. Cumberland, Jr., Edda S. Post, Kaufman & Cumberland, David B. Webster, Webster & Webster, Cleveland, OH, for Plaintiffs.

David W. Herrington, Wegman, Hessler, & Vanderburg, Thomas M. Stickney, Collins & Scanlon, John Rogers Jewitt, Jr., Carter E. Strang, Arter & Hadden, Lee A. Chilcote, Jr., Hahn, Loeser & Parks, Carter E. Strang, Arter & Hadden, Cleveland, OH, for Defendants.

### MEMORANDUM AND OPINION

HEMANN, United States Magistrate Judge.

### OUTLINE OF MEMORANDUM AND OPINION

I. Background ....................................................................703
 A. Development of the site ................................................703
 B. Tenantship at the site by Acme ........................................704
 1. Operations .......................................................704
 2. Drum storage ....................................................706
 C. Tenantship at the site by Albatross ...................................707
 1. Drum storage ....................................................707
 2. Drains and septic disposal ......................................708
 3. Oil contamination ...............................................709
 D. Ownership of the site by Bob's Beverage ...............................709
 E. Contamination by CVOCs ................................................710
II. Summary judgment standard ...............................................711
III. Plaintiffs' motion for summary judgment .................................712
 A. Claim under 42 U.S.C. § 9607(a) .......................................712
 1. The two causes of action ........................................712
 2. PRPs, the third party defense, and availability of action under § 9607(a) ....................................................713
 3. Plaintiffs and the third party defense ..........................714
 a. Third party sole cause of the release ........................714
 b. Release not in connection with a contractual relationship .....714
 c. Precautions against foreseeable acts or omissions of third party .....715
 d. Exercise of due care with respect to hazardous substance ..........715
 B. Elements of a cause of action authorized by 42 U.S.C. § 9613(f) ........717
 C. Summary judgment as to issues raised under § 9613(f) ..................717
 1. Whether the properties at 9810 and 9812 East Washington Street and contiguous properties contaminated by CVOCs are a "facility" .....717
 2. Whether the CVOCs found at the site are hazardous substances .........717
 3. Whether the defendants are "persons" for purposes of liability under § 9607(a) .......................................................718
 4. Whether a release or threatened release has occurred ..............719
 5. Whether the release caused plaintiffs to incur response costs .....720
 6. Whether the incurred response costs are necessary and consistent with the NCP .....................................................720

7. Whether all defendants are liable for contribution under § 9613(f) because they fall within a category of persons who are liable under § 9607(a) ................................................721
 a. "Owner or operator"........................................721
 b. "Disposal" ...............................................722
 c. Liability of defendants as owners or operators at the time that hazardous substances were disposed of.........................722
 1. Liability of defendant Acme....................................722
 2. Liability of defendant Bares ...................................723
 a. Direct liability as operator ...............................723
 b. Derivative liability as corporate officer ...................723
 3. Liability of defendants B. Merkel and H. Merkel ...............724
 a. Direct liability as owners ................................724
 b. Derivative liability as partners ..........................725
IV. Defendants Acme and Bares' joint motion for summary judgment ................725
 A. Whether the court should "pierce the corporate veil" of Acme to find Bares indirectly liable for Acme's acts under CERCLA....................725
 B. Whether Acme is a viable party in this litigation .........................726
 C. Whether Bares violated Ohio Rev.Code § 1701.88(A) or § 1701.97............727
 D. Whether Acme and Bares violated CERCLA as operators of the facility.....728
V. Joint motion for summary judgment of defendants Albatross and the Merkels.....729
 A. Whether defendants are not liable because only active conduct which causes contamination can trigger CERCLA liability for response costs.....729
 1. Liability under § 9701(a)(1) ........................................729
 a. Liability as owners of the site as set forth in § 9607(a)(1)...........729
 b. Liability as operators of the site as set forth in § 9607(a)(1).........729
 2. Liability under § 9607(a)(2) ........................................730
 a. Liability as owners of the site as set forth in § 9607(a)(2)............730
 b. Liability as operators of the site as set forth in § 9607(a)(2).........731
 B. Whether Albatross is not liable for response costs under CERCLA because Albatross did not dispose of any hazardous substance or hazardous waste ................................................732
VI. Conclusion ...................................................732

This matter is before the magistrate judge pursuant to consent of the parties. Plaintiffs commenced this action pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). Before the court are the motion of plaintiffs, Bob's Beverage, Inc. ("Bob's Beverage") and Ullman Oil, Inc. ("Ullman Oil"), for summary judgment ("Pl.Mot.," Docket # 85), ·the motion of defendants Acme, Inc. ("Acme") and James D. Bares ("Bares") for summary judgment ("Def.Mot.," Docket # 102), and the motion of defendants Albatross, Ltd. ("Albatross"), Benjamin Merkel ("B.Merkel"), and Henry H. Merkel ("H.Merkel") for summary judgment (Docket # 84). For the reasons set forth below, the court grants plaintiffs' motion in part and over-rules it in part; grants the motion of defendants Acme and Bares in part and over-rules it in part; and overrules the motion of defendants Albatross, B. Merkel, and H. Merkel.

## I. Background

### A. Development of the site

In 1960 Cleo Gastemire sold to Ray and Nancy Hitchcox undeveloped farmland which is presently property at 9810 and 9812 East Washington Street, Chagrin Falls, Ohio. The Hitchcoxes established a store on the property at 9810 East Washington Street. That store, currently known as "The Hitchin' Post," is both a convenience store and service station. Deposition of Kim A. Ullman, Def.Mot., Defendants' Joint Appendix of Exhibits ("Def.App."), Exh. F, pp. 71, 93–94. The

Hitchcoxes sold the 9810 East Washington Street property in 1972 to Marilyn Ullman. The property later came into the possession of Bob's Beverage, a corporation owned by members of the Ullman family. *Id.* at 21, 83–84.

In approximately 1973 the Hitchcoxes erected a building ("the building") on the 9812 East Washington Street property ("the site"). The Hitchcoxes leased space in the building to various tenants in the early 1970's. The record does not describe the activities in which these tenants engaged while at the site.

The Hitchcoxes installed a septic system for the building. The system as approved consisted of four-inch pipe which ran from a drinking fountain and toilet to two 1,000–gallon septic tanks in series and then to two 1,000–gallon dry wells in series. Application of John Blazek on behalf of Ray Hitchcox for a sewerage and well permit, Plaintiff's Revised Appendix Filed in Support of Motion for Summary Judgment ("Pl.App.") (Docket # 104), Exh. 1, p. 3. The system was designed to leach effluent which reached the dry wells into the surrounding soil. Deposition of Frank Szoka ("Szoka"), Def.App., Exh. H, pp. 16–17.

### B. *Tenantship at the site by Acme*

In 1974 Acme became a tenant in the building. Acme reconditioned automotive air conditioning equipment, and Bares was its president and sole owner. Plaintiff's First Request for Admissions Propounded to Defendant James D. Bares, Pl.App., Exh. 2, p. 3; Deposition of Bares, Def. App., Exh. K, p. 23, 24.

#### 1. *Operations*

Acme altered the building when it became a tenant. The alterations included cutting drainage ditches into the concrete floor for moving chemicals, wash water, and other waste materials away from work areas. Affidavit of Paul C. Mason ("Ma-

son"), Pl.App., Exh. 5, p. 4. According to William Burke ("Burke"), the technical director of operations for Acme at the site, the material that drained into the ditches was soapy water, harmless abrasive grit, and chemicals washed from parts taken from a caustic soda wash. Deposition of Burke, Def.App., Exh. O, pp. 27–28, 35, 37–38, 45–46. Bares admitted that the rinse water from Acme's operations was discharged into the septic system and that it had been used to wash parts coming from the caustic soda tank. Letter of Apr. 13, 1979 from Bares to the Ohio Environmental Protection Agency ("Ohio EPA"), Pl.App., Exh. 3; Def.App., Exh. K, pp. 92–93. Mason, who worked for Acme during the summer of 1974 and then full-time from 1975 until 1978, asserts that the waste water included solvents. Pl.App., Exh. 5, p. 4. Acme originally disposed of this waste water by emptying it into the septic system. Pl.App., Exh. 3, p. 1; Def. App., Exh. K, pp. 72–73; Exh. O, pp. 26–28, 35, 37–38, 58. By 1979 Acme disposed of the waste water by dumping it onto the surface, from which it eventually entered tributaries of the Chagrin River. Application for permit to discharge, Pl.App., Exh. 4; Def.App., Exh. K, pp. 92–93.

Employees disassembled old air conditioning units at "tear down" tables. According to Mason, "Any refrigerants or oils that were in the units would spill onto the tear down tables and the spilled material was collected in a drum at the end of the tables. When full, the drum would be taken outside and placed in the drum storage area." Pl.App., Exh. 5, pp. 5–6. Bares claims that only oil was collected at tear down tables and that it was stored in a 55–gallon drum inside the building for reclamation. Def.App., Exh. K, p. 89, 102.

Cleaning the disassembled parts involved a variety of hot and cold chemical baths and washes. One bath involved a

"trichlor tank." Mason remembers that this tank held 30 to 55 gallons of solvent and had heating elements at the bottom. Pl.App., Exh. 5, p. 4. Bares asserts that it held no more than 30 gallons of solvent. Def.App., Exh. K, p. 83. The tank originally used trichloroethylene as its cleaning solvent. Pl.App., Exh. 5, p. 4; Def.App., Deposition of Mason, Exh. M, p. 21; Exh. K, p. 88. Mason claims that the tank later used 1,1,1–trichloroethane. Pl.App., Exh. 5, p. 4; Def.App., Exh. M, p. 21. Bares avers that the trichloroethylene was replaced by a detergent containing no chlorinated volatile organic compounds ("CVOCs"). Def.App., Exh. K, p. 92. David Felger ("Felger"), who was a shop foreman for Acme while it was at the site and who currently works for a company owned by Bares' niece, remembers the trichlor tank as containing 1,1,1–trichloroethene and has no memory of trichloroethane. Deposition of Felger, Def.App., Exh. L, pp. 47–48; Exh. K, pp. 18, 38; Exh. M, p. 27.

About every two months spent solvent was scooped out of the trichlor tank and into 55–gallon drums. Pl.App., Exh. 5, p. 4. Mason asserts that these "drums were placed outside in the drum storage area." *Id.* Bares, Burke, and Felger claim that the drums were kept inside the building until they were sold back to the suppliers for reclamation. Def.App., Exh. K, pp. 57–59, 82–83; Exh. L, pp. 52, 58–60, 68; Exh. O, pp. 11, 52.

Another heated bath used a 80– to 90–gallon mixture of water and caustic soda (i.e. sodium hydroxide). Pl.App., Exh. 5, p. 5. The Environmental Protection Agency lists sodium hydroxide as a hazardous substance. 40 C.F.R. § 302.4. Mason remembers that parts removed from the caustic soda bath were washed or scrubbed, and the waste liquids spilling from the parts ran into drains in sinks or in the concrete ditches. Pl.App., Exh. 5, p.

5. Felger denies that caustic waste was washed into the ditches, but he does not remember what did happen to the spilled liquid. Def.App., Exh. L, pp. 66–67, 73. Waste pumped from the caustic soda bath "was handled in much the same way as the waste from the [trichlor] tank," according to Mason. Pl.App., Exh. 5, p. 5. Bares asserts that the caustic waste tank was pumped out by a local septic tank cleaner when the tank was cleaned. Def.App., Exh. K, p. 59. He "guesses," however, that residue of caustic soda was included in material pumped into the septic system. *Id.* at 78–79.

Acme also used other unidentified chemicals and solvents. Pl.App., Exh. 5, p. 5. At least one naptha-like solvent was purchased from Ullman Oil next door to the site and brought over in 55–gallon drums by forklift. Def.App., Exh. M, pp. 17–19.

Mason claims that parts were "power washed" after removal from the baths. Pl. App., Exh. 5, p. 6. The power washing flushed the "various solvents and chemicals" on the parts from the baths "into the floor drains with concrete bottoms," according to Mason. *Id.* Burke denies that any solvents were ever introduced into the septic system. Def.App., Exh. O, p. 67.

Mason claims that on one occasion he saw a hose run from the caustic tank or a cold stripper tank to siphon chemicals out of a window and onto the ground outside. Def.App., Exh. M, pp. 31–35. He contends that he went outside a few days later and saw the vegetation dead where the chemicals had been dumped from the siphon. *Id.* at 36. Bares, Burke, and Felger deny that any chemicals were ever drained outside by siphon, although Burke says that clean water which cooled the trichlor tank might have been siphoned outside. Def. App., Exh. O, p. 74.

## 2. Drum storage

According to Mason Acme transferred to the site 12 to 18 55–gallon drums when it became a tenant in the building. Pl. App., Exh. 5, p. 1; Def.App., Exh. K, pp. 56–57; Exh. M, pp. 30, 55–56. These drums had been stored at a property at Chagrin Road at which Acme had been conducting operations prior to leasing space in the building. Pl.App., Exh. 5, p. 2; Def.App., Exh. K, pp. 56–57. Mason avers that the drums were full of spent and new solvents and other chemicals which Acme had generated at the Chagrin Road property and that some of the drums were "deteriorated" when Acme moved them. Pl.App., Exh. 5, pp. 1–2. Felger says that only 10 to 15 drums were moved and contends that the drums contained air conditioning compressors waiting to be torn down and rebuilt, miscellaneous junk, and some solvents. Def.App., Exh. L, p. 17.

Mason also asserts that the drums containing spent solvents and chemicals which were moved to the site "were placed outside, near the back of the East Washington Street building regardless of their existing condition." Pl.App., Exh. 5, p. 2; see also Def.App., Exh. M, pp. 28–29. Felger says that three or four drums were stored outside but that none of the barrels contained solvent or oil. Def.App., Exh. L, pp. 18, 33, 36–37, 64. Bares also contends that no barrels containing chemicals were stored outside. Def.App., Exh. K, pp. 57–58. Burke asserts that the outside barrels had compressor parts in them, not liquid, and that no barrels with solvent in them were "deteriorated." Def.App., Exh. O, p. 66. Robert Halcik ("Halcik"), a salesman for Acme while it was at the site, also denies seeing liquid other than rainwater in the barrels. Deposition of Halcik, Def.App., Exh. P, p. 24.

Drums filled with spent solvent and other waste chemicals generated by Acme at the site were "placed in the same area as the drums from the Chagrin Road facility," according to Mason. Pl.App., Exh. 5, p. 2. Mason asserts, "While I worked for Acme these drums were never moved once they were placed there. I saw some drums that had rusted through and other drums that were seeping their contents from the top in the outside drum storage area." Pl. App., Exh. 5, p. 6. Mike Cathan, who worked for Acme at the site, also claims that drums containing liquid were stored outside the building. Deposition of Cathan, Def.App., Exh. N, pp. 11–12, 18.

Bares asserts that no spent solvents were placed outside the building. Def. App., Exh. K, pp. 59–61. According to Bares all chemical wastes except the caustic soda waste were kept in drums inside the building until they were reclaimed by the chemical suppliers. Id. at 58–59. Felger agrees that no drums containing liquid were kept outside the building. Def.App., Exh. L, pp. 27, 63–64. Burke denies that drums containing solvent were ever stored outside. Def.App., Exh. O, p. 24.

At one time, Mason says,

a fork lift driver punched through a drum full of chemical waste while adding drums to the outside drum storage area. The contents of the drum was [sic] released though the puncture in the drum onto the bare ground. To the best of my knowledge the spilled material was never cleaned up and the remaining contents of the drum were not transferred to a drum in good condition.

Pl.App., Exh. 5, p. 2; see also Def.App., Exh. M, pp. 59–60. Bares does not recall such an incident. Def.App., Exh. K, pp. 62–63. He admits that some outside drums may have been pierced by a forklift but contends that because all outside drums contained solid metal compressor cores, no leak of waste material could have resulted from such an accident. Id. at 62–

64. Felger says that he saw drums with compressor parts or junk in them pierced by a forklift but not drums containing liquid. Def.App., Exh. L, pp. 27, 63–64.

Mason claims that on at least one occasion he reported to Burke that drums were on their sides or leaking. Pl.App., Exh. 5, p. 5. Mason did "not recall any action that was taken in response" to his report to Burke. *Id.* Mason avers that Burke "had personal knowledge of the drum conditions" and that Burke "reported directly to Jim Bares, the President of Acme." *Id.* Bares denies that Burke ever told him about such an event. Def.App., Exh. K, pp. 67–68.

Mason says that on at least one occasion he reported to Halcik that drums in the outside storage area were on their sides or leaking. Pl.App., Exh. 5, p. 5. Mason claims that "Halcik did not instruct [Mason] or to the best of [Mason's] knowledge, anyone else to remedy the situation." *Id.* Bares denies that Halcik ever told him about such an event. Def.App., Exh. K, pp. 68.

Mason claims that Bares had personal knowledge of the operations and drum storage at the facility. Pl.App., Exh. 5, p. 3. Felger asserts that Bares was at the site daily, was never absent from the company for a long time, had an office at the site, and was involved in operations at the site. Def.App., Exh. L, pp. 21, 22–23, 24, 69. Burke contends that Bares managed operations at the site, that he knew and approved of how the hazardous chemicals were handled at the site, and that he could have directed that the chemicals be handled differently. Def.App., Exh. O, pp. 12, 33, 64–65. Bares denies involvement in the daily operations of Acme. Pl.App., Exh. 2, p. 3.

*C. Tenantship at the site by Albatross*

Acme left the site in approximately 1980. Pl.App., Exh. 2, p. 4. In 1980 Huntington

National Bank of Burton, Ohio ("Huntington") filed a foreclosure action against the Hitchcoxes. Huntington bought the site on September 3, 1981 at a sheriff's sale.

Huntington sold the property on August 13, 1982 to Albatross, Ltd. of Chagrin Falls, Ohio. Albatross was a limited partnership consisting of B. Merkel, H. Merkel and Lawrence Vail ("Vail") which stored antique cars at the site. Deposition of H. Merkel, Def.App., Exh. Q, p. 14. B. Merkel claims that none of the partners used solvents at the site. Deposition of B. Merkel, Def.App., Exh. R, p. 62. Albatross did not perform an environmental inspection of the site before buying it. *Id.* at 14–15, 17–18; Def.App., Exh. Q, pp. 26–27.

*1. Drum storage*

Bares claims that the auctioneers ordered everything that was outside the building brought inside for sale at the public auction upon Huntington's foreclosure. Def.App., Exh. K, p. 102. Szoka, an excavator, remembers that about 100 55-gallon drums remained on the property after Albatross bought it. Deposition of Szoka, Def.App., Exh. H, pp. 20–22, 48. H. Merkel remembers about 9 to 12 drums by the loading dock outside the building, and about 4 to 6 other drums scattered around the outside lot. Def.App., Exh. Q, pp. 29–33, 107. B. Merkel remembers about eight drums by the loading dock and 3 or 4 scattered elsewhere on the lot. Def.App., Exh. R, p. 20. Photographs taken after Albatross took possession confirm that some drums were scattered on the property; the photographs do not show the loading dock. Def.App., Exh. Q, pp. 69–71.

H. Merkel remembers three of the outside drums as containing rainwater. *Id.* at 29–31, 108; Def.App., Exh. R, p. 23. One of these drums was emptied into Ullman

Oil's waste storage tank. Def.App., Exh. Q, pp. 30–31, 108–09; Exh. R, pp. 20–21. The others were dumped at the site. Def. App., Exh. Q, pp. 30–32; Exh. R, pp. 60–61.

According to the Merkels about four drums were filled with what appeared to be thick, viscous lubricating oil. *Id.* at 32, 64, 117, 120–21; Def.App., Exh. R, p. 20. These were covered and intact, and they were eventually pumped out and their contents disposed of by Research Oil Company ("Research Oil") in September, 1987. Def.App., Exh. Q, pp. 32, 64; Exh. R, pp .. 60–61. Research Oil identified the substance pumped with the initials "WW/WO." Def.App., Exh. Q, pp. 114–15.

The Merkels also assert that about three drums were partially filled with apparently the same material as the four full drums pumped by Research Oil. *Id.* at 120–21; Def.App., Exh. R, pp. 21–22. They say that the material in these drums was consolidated into a single, nearly-full drum, and that drum was also pumped by Research Oil. Def.App., Exh. Q, p. 121; Exh. R, p. 21, 60–61. The Merkels also claim that none of the drums containing the oil-like substance was leaking. Def.App., Exh. Q, p. 32; Exh. R, p. 22.

H. Merkel asserts that the remaining outside drums were either empty or filled with trash. *Id.* at 32–33. He says that they had no sludge or coating in them. *Id.* at 81, 122.

H. Merkel recollects that there were about 6 to 8 drums inside the building when Albatross occupied it; B. Merkel remembers 5 or 6. Def.App., Exh. Q., pp. 27, 101; Exh. R, p. 19. Some of the drums contained trash; others contained auto parts. Def.App., Exh. Q., pp. 28, 102; Exh. R, p. 18–19. H. Merkel also remembers that one drum contained what appeared to be fresh lubricating oil and that it too was pumped by Research Oil in September, 1987. Def.App., Exh. Q, pp.

28, 64, 126. H. Merkel asserts that none of the drums contained anything which "even remotely" could have been a solvent. *Id.* at 102.

### 2. Drains and septic disposal

Albatross found a channel about eight to ten inches wide, four inches deep, and six feet long cut near the middle of the concrete floor of the building. *Id.* at 42–43. It also found a "floor drain," described as a trench covered by a metal grate, running east-west for almost the length of the building. *Id.* at 44; Def.App., Exh. R, p. 26. Photographs taken after Albatross took possession of the property are consistent with the existence of these trenches as described. *Id.* at 74–75.

Albatross contracted with Szoka or Szoka Excavating to replace the existing septic system at the site with one approved by the Ohio EPA. Def.App., Exh. H, pp. 9–11; Exh. Q, p. 51–52. The existing septic system was not operational. Def.App., Exh. H, pp. 6–18; Exh. Q, pp. 36–37, 51–52; Exh. R, pp. 31–32. The drywells which had been built to accept septic effluent and leach it into the ground would no longer accept the effluent because the soil in which the drywells had been sited contained too much clay to allow the effluent to leach properly from the drywells. Def. App., Exh. H, pp. 27–29.

Szoka installed the new septic system in 1984. Def.App., Exh. Q, p. 81. He found that a pipe had been installed in the septic system to allow the effluent to bypass the dry wells and empty into a ravine and watercourse at the back of the property. *Id.* at 17, 28. When Szoka removed the existing septic tank, he found it to be lined with 2–4 inches of an unusual greasy, unidentified coating that had a smell similar to that of oil. Def.App., Exh. H, pp. 12–13. The inside of the tank was scrubbed and flushed three times to remove the coating.

*Id.* at 13–14, 16. The coating removed from tank was taken from the property. *Id.* at 14. H. Merkel asserts that no one told him about the unusual substance that was found in the septic system at the time, but B. Merkel remembers that Vail told him something about it. Def.App., Exh. Q, pp. 56–57, 86; Exh. R, pp. 41–42. B. Merkel remembers that nothing said to him led him to believe that he should be concerned about what was found in the septic system. Def.App., Exh. R, pp. 42–43.

Szoka's upgrade of the septic system included the creation of a leachfield. Sewerage plans approved by Ohio EPA, Pl. App., Exh. 15; Def.App. H, pp. 17–18. Effluent went from the building to a dozing tank, from which it was pumped to a sand filter. Def.App. H, pp. 18. The effluent sank through the sand filter, then it was piped to a 1,000–foot leach bed north of the building. *Id;* Pl.App., Exh. 15.

Installation of the new septic system may have involved the movement of large quantities of soil north of the building. According to Mark F. Deering ("Deering"), a geologist for Sanborn, Head & Associates ("Sanborne"), "During the excavation of the area, the CVOCs that were in the soils were moved and dispersed." Affidavit of Deering, Pl.App., Exh. 18, p. 2; *see also* photographs of septic installation, Pl.App., Exh. 17. Deering is also of the opinion that "the movement of the CVOC contaminated soils volatized some of the contaminants and emitted them into the ambient air." Affidavit of Deering, Pl. App., Exh. 18, p. 2. The distribution of CVOCs in the soil loosely corresponds with the area in which the leachfield was created. *Cf.* area indicated as leachfield in Pl. App., Exh. 15 to Table 1: "Concentration of CVOCs in Soil Samples" ("Table 1"), Pl.App., Exh. 16. This area also partly overlaps the outside drum storage area, *cf.* Pl.App., Exh. 16, Table 1 to description of the outside drum storage area at Def.App., Exh. Q, p. 29, and it begins immediately downgradient (i.e. "downstream" of the flow of underground water) from the original septic system. *Cf.* the location of the original septic system in Pl.App., Exh. 1, p. 3 and in Defendants, Albatross Ltd., Benjamin Merkel and Henry Merkel's Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment (Docket # 100), Exh. DD to Pl.App., Exh. 16, Table 1; *see* Pl. App., Exh. 8, p. 20 regarding the generally southwest flow of underground water at the site.

### 3. Oil contamination

On January 4, 1988 Bob's Beverage discovered fuel oil or diesel oil coming from a water spigot at the "Hitchin' Post." Def. App., Exh. F, pp. 13–14, 134. The source of the fuel leak which caused this contamination has not been positively identified, but Bob Ullman, Inc. (renamed Ullman Oil on November 12, 1988) took responsibility for the contamination. *Id.* at 135–37. Ullman Oil contacted the Ohio EPA and its insurance company regarding the problem. By March 9, 1988 an oil recovery system had been put in place to clean up the contamination. *Id.* at 136. The Ohio Bureau of Underground Storage Tanks ("BUST") approved discontinuance of the primary cleanup in December 1991. Feasibility Study Report, Pl.App., Exh. 8., p. 4. Ullman Oil does have some ongoing responsibility to BUST to clean up this contamination, and there has been further bailing and pumping of wells to remove contaminants. *Id.;* Def.App., Exh. F, pp. 159–60.

### D. Ownership of the site by Bob's Beverage

Albatross sold the site to Bob's Beverage in May 1988. Plaintiff's Motion for Partial Summary Judgment, p. 6. Bob's

Beverage did not conduct an environmental assessment of the site before buying it, although it knew of the fuel oil contamination in the subsurface of the site. *Id.* at 6–7; Def.App., Exh. F, pp. 22–23. Bob Ullman, Inc. became the operator of the site in July 1988. Def.App. Exh. R, p. 6.

Albatross did not warrant the property to be free from contamination when it sold the site. Def.App., Exh. F, pp. 85–86, 94–95. H. Merkel avers that Albatross could not warrant that there was no environmental waste on the site because it "could not vouch for what had been done to the property before we had it." *Id.* at 86. B. Merkel asserts that the partners in Albatross had no knowledge of what business had been conducted on the site before they bought it, other than what could be deduced from the condition of the property. Def.App., Exh. R, pp. 14–15, 56.

*E. Contamination by CVOCs*

In November 1988 Bob's Beverage discovered CVOCs in groundwater samples taken from monitoring wells at the site. Pl.App., Exh. 8, p. 4. Investigators first detected CVOCs above the Maximum Contaminant Level (MCL) set by the Federal Environmental Protection Agency ("Federal EPA") in monitoring well MW–7 immediately north of the building. Pl.App., Exh. 8, p. 4; Exh. 16, Table 2: "Concentrations of CVOCs and BTEX Compounds in Shallow Groundwater" ("Table 2"). Analyses showed that "concentrations of 1,1–dichloroethene, tetrachloroethene, 1,1,1–trichloroethane, and trichloroethene routinely exceeded MCLs for samples analyzed between 1988 and 1991." Pl.App., Exh. 8, p. 4 (abbreviations deleted). Investigators detected "several CVOCs," including 1,1–dichloroethene above the M.C.L. § in recovery wells RW–2 and RW–3 and 1,1,1–trichloroethane above the M.C.L. § in well RW–3. *Id.* Wells RW–2 and RW–3 were respectively west and south of the building. Pl.App., Exh. 16,

Table 2. Beginning in 1988 investigators also detected CVOCs below MCLs in one monitoring well directly south of the building on the site (MW–10), in three monitoring wells south of the building across East Washington Street (MW–4, MW–8, MW–9), and in one monitoring well west of the building and west of the Hitchin' Post at the Nasady residence (MW–5). Pl.App., Exh. 8, p. 5; Exh. 16, Table 2.

Investigators sampled four private water supplies west, south, and east of the building in November 1991. Pl.App., Exh. 8, p. 5. They detected 1,1–dichloroethene, 1,1–dichloroethane, and tuolene below MCLs in the Konst water supply directly south and across the street from the building. *Id.* In October 1994 they detected CVOCs in the Auburn Center Plaza water supply east of the building. *Id.* at 20. The level of CVOCs in both water supplies has increased over time. *Id.*

Bob's Beverage reported the detection of CVOCs in 1989 through 1991 to the BUST as part of its remediation of petroleum products contamination. *Id.* Bob's Beverage notified the Ohio EPA of the detection of CVOCs on June 17, 1992. Pl. App., Exh. 8, p. 5. Bob's Beverage entered into a consent order with Ohio EPA, effective September 13, 1994, requiring it to complete a remedial investigation and a feasibility study regarding CVOC contamination. *Id.* at 5; Administrative Order on Consent, Pl.App., Exh. 19. Despite entering into a consent order, both Bob's Beverage and Ullman Oil aver that they have never "used, stored, treated, or disposed of chlorinated solvents at 9810 or 9812 East Washington Street property." Plaintiff's Motion for Partial Summary Judgment, p. 7.

Ullman Oil undertook the remedial investigation and feasibility study on behalf of Bob's Beverage. Pl.Mot., p. 17. Sanborn was retained to conduct the remedial

investigation and feasibility study required by the consent order. Pl.App., Exh. 9, p. 1.

Sanborn held a public meeting in conjunction with the Ohio EPA on June 5, 1995 to provide information regarding the status, plans, and objectives of the remedial investigation to the public, in accordance with the Remedial Investigation Workplan. *Id.* at 6. Sanborn also set up and has maintained a repository of documents related to the remedial investigation at the Bainbridge Branch of the Geauga County Library. *Id.*

Sanborn discovered 1,1,1–trichloroethane and trichloroethylene on the site. Pl. App., Exh. 8, p. 2. It also discovered 1,1–dichloroethylene, a breakdown product of trichloroethylene, and 1,1–dichloroethane, a breakdown product of 1,1,1–trichloroethane, in water wells east and south of the site. *Id.* The investigation identified an area north of the Ullman Oil building as the source of these contaminants. *Id.* Investigators found that "[g]roundwater quality data indicate clearly that CVOCs have migrated from the identified source area at the site. These contaminants will continue to migrate in groundwater, impacting water quality conditions at and in the vicinity of the Site." *Id.* Investigators are of the opinion that the CVOCs at the site "have migrated from the surface or the shallow subsurface and through the soil to the groundwater...." Deposition of Deering, Def.App., Exh. S, p. 165. More particularly, the investigators found that "these chemicals could have been released to the ground by leakage or spillage from drums, discharge to the subsurface via septic system components (drag-out of solvents from parts cleaning, for example), or direct discharge to the ground surface." Pl.App., Exh. 9, p. 4.

Sanborn submitted its Remedial Investigation Report to the Ohio EPA in June 1996. *Id.* at 1. The Ohio EPA approved that report on October 3, 1996. Letter of October 3, 1996 from Ohio EPA to Deering, Pl.App., Exh. 20. Sanborn and the Ohio EPA agreed on the basis of that report "that it was appropriate to focus the scope and approach of the [feasibility study] to a review of technologies related to groundwater extraction and treatment and source area remedy." Pl.App., Exh. 9, p. 1. Sanborn completed the feasibility study in accordance with the consent order and according to evaluation criteria included in the National Contingency Plan (NCP). *Id.* Sanborn submitted the Feasibility Study Report to the Ohio EPA in July 1988, and that report is currently under Agency review. *Id.* at 1–2; *see also* Feasibility Study Report, Pl.App., Exh. 16, pp. 25–26.

Ullman Oil claims to have incurred $441,622.85 in expenses associated with remedial action in response to the contamination. Summary of Expenses Associated with Remedial Action for Ullman Oil, Inc., Pl.App., Exh. 24. It asserts that none of these expenses is related to the clean-up of the petroleum contamination discovered in 1988. Def.App., Exh. F, pp. 183–85.

II. Summary judgment standard

All parties move for partial or total summary judgment on the complaint. Summary judgment is appropriate only when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party must demonstrate through reference to pleadings and discovery the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The nonmoving party must then show the existence of a material fact which must be tried. *Id.* at 324, 106 S.Ct. 2548.

When evaluating a motion for summary judgment, "the inferences to be drawn

from the underlying facts ... must be viewed in the light most favorable to ... the party opposing the motion...." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see also Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Aetna Ins. Co. v. Loveland Gas & Elec. Co.,* 12 Ohio Misc. 230, 369 F.2d 648 (6th Cir.1966). This includes taking the nonmoving party's uncontradicted allegations as true and giving the benefit of the doubt to the nonmoving party's assertions when they conflict with those of the movant. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Bosely v. City of Euclid,* 496 F.2d 193, 197 (6th Cir.1974).

The court's treatment of facts and inferences in a light favorable to the nonmoving party does not relieve that party of its obligation "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. The nonmoving party may oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves ...," *id,* or by any other evidentiary material admissible at trial. *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993); *see also* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE, 10A, § 2721 (1998). A scintilla of evidence in favor of the nonmoving party is not sufficient. There must be enough evidence that a reasonable jury could find for the nonmoving party. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989).

### III. Plaintiffs' motion for summary judgment

#### A. Claim under 42 U.S.C. § 9607(a)

Plaintiffs Bob's Beverage and Ullman Oil move for summary judgment as to certain issues implicated in a cause of action under 42 U.S.C. § 9607(a). Defendants Acme and Bares respond that plaintiffs have no cause of action under § 9607(a) because they are potentially responsible parties ("PRPs") who only may bring a cause of action against defendants under 42 U.S.C. § 9613(f). This argument is well taken.

#### 1. The two causes of action

CERCLA provides causes of action for private parties seeking to recover the costs of remediating a hazardous waste site from parties who share responsibility for the disposal of waste at the site. Title 42 U.S.C. § 9607(a) authorizes a party who has incurred costs in removing contamination from a site to recover these response costs from PRPs. Section 9607(a) provides in relevant part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
>> (1) the owner and operator of a vessel or a facility, [and]
>> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for ... (B) any ... necessary costs or response incurred by any other person consistent with the national contingency plan....

Title 42 U.S.C. § 9613(f)(1) also provides a cause of action by which a party who has incurred response costs may seek reimbursement from responsible parties:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules

of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.

■ The two causes of action differ in important respects. Liability under § 9607(a) is strict and usually joint and several. *Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 348 (6th Cir.1998). Damages will be apportioned according to fault only if a defendant can affirmatively demonstrate that the harm suffered is divisible into discrete, lesser harms whose causes are attributable to particular parties. *Id.; United States v. Township of Brighton*, 153 F.3d 307 (6th Cir.1998).

■ Liability under § 9613 is equitable and several. *Centerior*, 153 F.3d at 348. Plaintiff has the burden of establishing each party's equitable share of response costs. *Id.*

*2. PRPs, the third party defense, and availability of action under § 9607(a)*

■ The Sixth Circuit has found generally that "parties who are themselves PRPs, potentially liable under CERCLA and compelled to initiate a hazardous waste site cleanup, may not bring an action for joint and several cost recovery, but are limited to actions for contribution governed by the mechanisms set forth in CERCLA § 113(f)." *Id.* at 356. The Sixth Circuit has not found, however, that an "innocent" PRP who has not contributed to site contamination may not seek joint and several cost recovery under § 9607(a). *See Centerior*, 153 F.3d at 351, n. 10.

■ An innocent private party may bring an action under § 9607(a) even if the party is a PRP: "One example of an innocent private party is ... one who, although otherwise potentially responsible for paying necessary clean-up costs, 'can successfully assert one of the affirmative defenses enumerated in § 9607(b).' " *Dartron Corp. v. Uniroyal Chem. Co., Inc.*, 917 F.Supp. 1173, 1182 (N.D.Ohio 1996) (quoting *Kaufman & Broad–South Bay v. Unisys Corp.*, 868 F.Supp. 1212, 1214 (N.D.Cal.1994)). There are four defenses enumerated in § 9607(b): the contamination was caused 1) by an act of God, 2) by an act of war, 3) by an act or omission of a third party who is not the employee or agent of the party asserting the defense and was not acting in connection with a contractual relationship with that party (the "third-party defense"), or 4) by some combination of the preceding three.

Bob's Beverage and Ullman Oil are PRPs because they are current owner or operator of a waste facility. *Centerior*, 153 F.3d. at 347 n. 8; *see* 42 U.S.C. § 9607(a)(1). They claim that they are innocent PRPs and assert the third-party defense.

The third-party defense requires the party raising it to show by a preponderance of the evidence that (1) some other party was the sole cause of the release of hazardous substances and the damages caused by the release; (2) the party responsible for the release did not cause the release in connection with a contractual, employment, or agency relationship with the defendant; (3) the defendant took precautions against foreseeable acts or omissions of any third party and against the consequences that could foreseeably result from those acts or omissions; and (4) the defendant "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances...." Title 42 U.S.C. § 9607(b)(3)(a)–(b); *Westfarm Assoc.'s Ltd. Partnership v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669 (4th Cir.1995). This exception to

liability for PRPs is exclusive and must be rigorously applied: "This explicitly drafted exception ... signals Congress' intent to impose liability on landowners who cannot satisfy its express requirements." *Monsanto*, 858 F.2d at 168 n. 14.

### 3. Plaintiffs and the third party defense

#### a. Third party sole cause of the release

Plaintiffs have offered sufficient evidence to support their contention that some other party was the sole cause of the release of hazardous substances and the damages caused by the release. The evidence shows that CVOCs were originally deposited in a particular area at the site. Pl.App., Exh. 16, Table 1. The CVOCs detected include 1,1,1–trichloroethane, trichloroethylene, and CVOCs which are the products of the breakdown of 1,1,1–trichloroethane and trichloroethylene. Pl.App., Exh. 8, p. 2. Defendants Acme and Bares admit to having used 1,1,1–trichloroethane and trichloroethylene at the site. Pl.App., Exh. 2, p. 4; Def.App., Exh. K, pp. 79–80, 83–86. Sanborn's report asserts that "Ullman Oil has never used chlorinated solvents for any of its operations at the site." Pl.App., Exh. 8, "Executive Summary." The septic system which may have been a source of contamination was replaced and the barrels which may have contained CVOCs were removed before Bob's Beverage bought the site. These facts are sufficient to prove by a preponderance of the evidence that some party other than Bob's Beverage/Ullman Oil was the sole cause of the release of hazardous substances and the resulting damage.

#### b. Release not in connection with a contractual relationship

The facts presented are sufficient to show that the party responsible for the release did not cause the release in connection with a contractual, employment, or agency relationship with the plaintiffs. The phrase "in connection with a contractual relationship"

requires more than the mere existence of a contractual relationship between the owner of land on which hazardous substances are or have been disposed of and a third party whose act or omission was the sole cause of the release or threatened release of such hazardous substances into the environment, for the landowner to be barred from raising the third-party defense provided for in that section. In order for the landowner to be barred from raising the third-party defense under such circumstances, the contract between the landowner and the third party must either relate to the hazardous substances or allow the landowner to exert some element of control over the third party's activities.

*Westwood Pharms., Inc. v. National Fuel Gas Distrib. Corp.*, 964 F.2d 85, 91–92 (2nd Cir.1992); *see also State of New York v. Lashins Arcade Co.*, 91 F.3d 353, 360–61 (2nd Cir.1996). There must "be some relationship between the disposal/releasing activity and the contract with the defendant for a defendant to be barred from raising the third-party defense." *Westwood*, 964 F.2d at 88. Any other interpretation "would render the language 'in connection with' superfluous, a result generally at odds with an accepted principle of statutory construction." *Id.*

The only defendant with whom any plaintiff had a contractual relationship was Albatross. Bob's Beverage entered into a contractual relationship with Albatross when it bought the site from Albatross.[1]

---

1. Title 42 U.S.C. § 9601(35)(A) provides that "contractual relationship" as used in the statute includes "land contracts, deeds or other instruments transferring title or possession...."

The contractual relationship between Bob's Beverage and Albatross did not relate to the hazardous substances at issue or allow Bob's Beverage to exert some element of control over Albatross' activities related to the release of contaminants. Bob's Beverage may not be disqualified, therefore, from raising the third-party defense because of its contractual relationship with Albatross.

### c. Precautions against foreseeable acts or omissions of third party

The third element, that the party raising the defense "took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions ...," is not applicable to the instant case because the contamination took place before plaintiffs bought the site. The requirement that the party raising the defense has taken precautions against foreseeable acts or omissions of a third party "does not prevent a subsequent purchaser after contamination has occurred from claiming the defense, but only comes into play after the landowner acquires the property." H.R.Conf.Rep. No. 962 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 1986 WL 31924, at 12 (Legis.Hist.).

### d. Exercise of due care with respect to hazardous substance

Bob's Beverage has not offered sufficient evidence that it "exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances...." The statute does not define what "due care" means in this context. The House Report which accompanied CERCLA indicates that a party seeking to raise the defense "must demonstrate that he took all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and

circumstances." H.R.Rep. No. 1016, at 34 (1980), *reprinted in* 1980 U.S.C.C.A.N. 6119, 6137. "Due care" does not "impose a duty on a purchaser of land to investigate prior to purchase, in order to determine whether there is pollution on the land caused by someone with whom the purchaser is not in contractual privity." *Lashins,* 91 F.3d at 361 (quoting *HRW Systems, Inc. v. Washington Gas Light Co.,* 823 F.Supp. 318, 349 (D.Md.1993)). "Due care" does require a party, however, to take "those steps necessary to protect the public from a health or environmental threat." *Lashins,* 91 F.3d at 361 (quoting H.R.Conf.Rep. No. 962 (1986), *reprinted in* 1986 U.S.C.C.A.N. 3276, 1986 WL 31924, at 12 (Legis.Hist.), and *United States v. A & N Cleaners & Launderers, Inc.,* 854 F.Supp. 229, 238 (S.D.N.Y.1994)).

In the instant case Bob's Beverage first detected CVOCs in on-site groundwater well samples taken as part of its remediation of petroleum product contamination in November 1988. In that year investigators found CVOCs above the M.C.L. § in three wells north, west, and south of the building. One of those wells "routinely exceeded MCLs [for CVOCs] for samples analyzed between 1988 and 1991." Pl. App., Exh. 8, p. 4. Investigators also detected CVOCs below MCLs in one monitoring well directly south of the building (MW–10), in three monitoring wells south of the building across East Washington Street (MW–4, MW–8, MW–9), and in one monitoring well west of the building and west of the Hitchin' Post at the Nasady residence (MW–5) in 1988. Pl.App., Exh. 8, p. 5; Exh. 16, Table 2. In November 1991 investigators detected CVOCs below the MCLs in the Konst water supply directly south and across the street from the building. *Id.*

Bob's Beverage reported the detection of CVOCs in reports made in 1989 through

1991 to the BUST as part of its remediation of petroleum products contamination. *Id.* BUST is a bureau of the State Fire Marshall, which is in turn a division of the Ohio Department of Commerce. *See* BUSINESS & LEGAL REPORTS, INC., ENVIRONMENTAL COMPLIANCE IN OHIO, U–9 (1998). Ohio law charges the State Fire Marshall with supervising and regulating underground storage tanks and with taking action to correct petroleum releases. Ohio Rev. Code. §§ 3737.87 et seq. Neither the State Fire Marshall nor BUST has any authority to evaluate, correct, or supervise correction of a release of a non-petroleum contaminant unconnected with underground storage tanks.

Bob's Beverage did not report the detection of CVOCs to the Federal EPA. It did not report the detection of CVOCs to the Ohio EPA until June 17, 1992. Pl.App., Exh. 8, p. 5. This report came more than two and a half years after detecting CVOCs above the MCLs at three locations on its own property and more than seven months after detecting CVOCs in the drinking supply of a neighbor. Bob's Beverage failed to report the contamination more quickly even though, by its own account, many 55–gallon drums had been left outside, unattended on the property, which adjoined its own, for years. A reasonable jury could not conclude that Bob's Beverage took "all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances." [2]

Because Bob's Beverage has not offered sufficient evidence that it exercised due care with respect to the hazardous substance, it cannot claim to be an innocent landowner. Because it is a PRP who is not an innocent landowner, Bob's Beverage cannot initiate a cause of action under 42 U.S.C. § 9607(a). If Bob's Beverage has borne response costs related to the release of a hazardous substance, it must seek contribution under 42 U.S.C. § 9613(f).

Nor can Ullman Oil proceed as an innocent party under 42 U.S.C. § 9607(a). Ullman Oil, as the operator of the site, is a PRP. 42 U.S.C. § 9607(a)(1). It too must prove itself to be an innocent PRP to avail itself of the cause of action provided at § 9607(a). But Ullman Oil's claim to be an innocent PRP founders because the same persons who are the officers, directors, and owners of Bob's Beverage are also the officers, directors, and owners of Ulman Oil. Def.App., Exh. F, pp. 20–22. If those persons are not innocent in their legal persona of Bob's Beverage because they failed timely to report known CVOC contamination at the site to the proper authority, then they cannot be innocent in their legal persona of Ullman Oil. As either PRP they failed timely and properly to report known contamination and cannot now claim to have taken "all precautions with respect to the particular waste that a similarly situated reasonable and prudent person would have taken in light of all relevant facts and circumstances."

The court need not make fine distinctions regarding the capacity in which the joint officers, directors, and shareholders of Bob's Beverage and Ullman failed to act timely in addressing contamination at the site. Those parties themselves have blurred the capacities in which they addressed that contamination. Both Bob's Beverage, as owner, and Ullman Oil, as operator, are potentially liable for response costs for dealing with the CVOCs found at the facility. *See* 42 U.S.C.

---

**2.** Plaintiffs claim that Bob's Beverage provided an alternate water supply to neighboring properties affected by the contamination after detecting the CVOCs. They do not cite anything in the record in support of this assertion. It is, therefore, ignored.

§ 9607(a)(1). Yet Ullman Oil has paid the entire cost of implementing the plan outlined in the consent decree entered into between Bob's Beverage and the Ohio EPA. Answers to Defendants Albatross, Ltd. and Benjamin H. Merkel's First Set of Interrogatories Propounded to Plaintiffs, Def.App., Exh. E, p. 6; Pl.App., Exh.'s 19, 24. This does not reflect a punctilious observance of corporate forms.

For these reasons, if Ullman Oil has borne response costs related to the release of a hazardous substance, it must seek contribution under 42 U.S.C. § 9613(f).

**B. Elements of a cause of action authorized by 42 U.S.C. § 9613(f)**

An action under § 9613(f) allows a plaintiff to "seek contribution from any other person who is liable or potentially liable under [42 U.S.C. § 9607(a) ]." 42 U.S.C. § 9613(f)(1). Liability for contribution under § 9613(f) and available defenses to liability, therefore, are determined by § 9607(a). *Centerior,* 153 F.3d at 350.

■ There are four elements which a plaintiff must prove to establish a prima facie case for liability for response costs under § 9607(a): (1) the property at issue was a "facility" as defined by CERCLA; (2) there was a release or threatened release of a hazardous substance from the facility; (3) the release or threatened release caused plaintiffs to incur response costs that were necessary and consistent with the NCP; and (4) defendant was a person subject to liability under § 9607(a). *Centerior,* 153 F.3d at 347–48; *City of Toledo v. Beazer Materials and Serv.'s, Inc.,* 923 F.Supp. 1001, 1002 (N.D.Ohio 1996).

Plaintiffs ask for summary judgment as to issues raised under 42 U.S.C. § 9607(a).

**C. Summary judgment as to issues raised under § 9613(f)**

**1. Whether the properties at 9810 and 9812 East Washington Street and contiguous properties contaminated by CVOCs are a "facility"**

■ Plaintiffs move for summary judgment on the issue of whether the properties at 9810 and 9812 East Washington Street and those contiguous properties contaminated by CVOCs are a "facility" as defined by CERCLA. The court concludes that they are.

Title 42 U.S.C. § 9601(9) defines a "facility" for purposes of CERCLA:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located. . . .

Undisputed evidence shows that CVOCs have come to be located in the soil and groundwater of 9810 and 9812 East Washington Street and in the soil and groundwater of contiguous properties south and west of the site. Pl.App., Exh. 8, pp. 4, 5, 8; Exh. 16, Table 2. These CVOCs are hazardous substances. *See infra,* Ill.C.2.

Thus the properties at 9810 and 9812 East Washington Street and the contiguous properties south and west of the site fall squarely within the definition of "facility."

**2. Whether the CVOCs found at the site are hazardous substances.**

Plaintiffs move for summary judgment on the issue of whether CVOCs detected at

the facility are hazardous substances. The court concludes that they are.

Section 9601(14) defines "hazardous substance" as any substance designated pursuant to 42 U.S.C. § 6902 or any hazardous waste having the characteristics identified under or listed at 42 U.S.C. § 6921. Investigators have detected 1,1–dichloroethene, 1,1–dichloroethane, tetrachloroethene, 1,1,1–trichloroethane, and trichloroethene at the facility. Pl.App., Exh. 8, pp. 4–5; Exh. 16, Table 2. Of these, 1,1–dichloroethane, tetrachloroethene, 1,1,1–trichloroethane, and trichloroethene are listed by the Federal EPA at 40 C.F.R. § 302.4, pursuant to 42 U.S.C. § 6902, as being hazardous substances.

No genuine issue of material fact remains regarding this issue. The 1,1–dichloroethane, tetrachloroethene, 1,1,1–trichloroethane, and trichloroethene found at the facility are hazardous substances.[3]

3. *Whether the defendants are "persons" for purposes of liability under § 9607(a)*

Plaintiffs argue that defendants Bares, Acme, Albatross, B. Merkel, and H. Merkel are "persons" for purposes of liability under § 9607(a). The court agrees.

Section 9607(a)(2) provides for liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of. . . ." Section 9601(21) defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." Defendants are facially "persons" within the meaning of the statute. Bares, B. Merkel, and H. Merkel are individuals; Acme is a corporation; and Albatross is a partnership.

Acme argues that it is not a viable party to this litigation because the corporation has been dissolved and its assets sold. It contends that Acme no longer exists as a legal entity which might participate in the litigation. That argument is not well taken.

Common law abated all litigation to which a corporation was a party when the corporation dissolved. The life of a corporation may be prolonged by statute, however, for purposes of litigation. *Chadwick v. Air Reduction Co.*, 5 Ohio Misc. 171, 239 F.Supp. 247, 250 (N.D.Ohio 1965) (citing 13 Ohio Jurisprudence 2nd, Corporation, § 937). Ohio Rev.Code § 1701.88 provides:

(A) When a corporation is dissolved voluntarily, when the articles of a corporation have been canceled, or when the period of existence of the corporation specified in its articles has expired, the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, or to obtain reinstatement of the articles . . .

---

**3.** Plaintiffs also claimed that "perchloroethane, . . . spent heavy metals and other contaminants have been found at the site." Pl. Mot., p. 12. The citation in support of this claim was to "Appendix at B." Since the Appendix submitted by plaintiffs with their motion for summary judgment was numbered rather than lettered, the court does not know where to look for "Appendix at B." The citation is therefore ignored. Plaintiffs also cited 40 C.F.R. § 261 .1 and the Ohio Administrative Code § 3745–51–30 for support for the proposition that certain chlorinated solvents are hazardous wastes. Title 40 C.F.R. § 261.1 contains no information which would support that proposition. The Ohio Administrative Code is irrelevant in determining what is hazardous waste under federal law unless plaintiffs cite some provision in federal law which would make it relevant. Plaintiffs have not cited such a provision.

and for such purposes it shall continue as a corporation.

(B) Any claim existing or action or proceeding pending by or against the corporation or which would have accrued against it may be prosecuted to judgment, with right of appeal as in other cases....

Such a statute "extending the vitality of a dissolved corporation for purposes of suit are remedial in nature and should be given a liberal construction." *Chadwick*, 239 F.Supp. at 251 (citing 16 A FLETCHER CYCLOPEDIA, Corporations § 8143); *see also American Oak Leather v. Peck*, 48 Ohio Op. 291, 296, 108 N.E.2d 179, 183 (1951).

■■■ *Chadwick* construed the meaning of Ohio Rev.Code § 1701.88 regarding causes of action which would have accrued against a corporate entity had it not dissolved:

Any claim existing (not yet sued upon) or action or proceeding (already commenced) pending by or against the (dissolved) corporation or (any claim not yet sued upon or action or proceeding) which would have accrued against it (had dissolution not occurred) may be prosecuted to judgment, with right of appeal as in other cases....

*Chadwick*, 239 F.Supp. at 251. Ohio courts are in accord with this position. In *North Consultants, Inc. v. Jane Stimel–Givens* the court observed that cancellation of a corporation's charter

in no way represents a forfeiture of the corporation's franchise. The cancellation represents no more than a suspension of the corporation's right to do business. The corporation may continue to operate as is necessary in the winding-up process, and *formal action in quo warranto is required to revoke its corporate charter.* Moreover, even if a corporation is dissolved it may still be sued, and satisfaction or performance of any judgment obtained may be enforced against such corporation.

1985 WL 10281, at *3 (Ohio App. 10 Dist. May 14, 1985) (emphasis added) (citations omitted); *see also Diversified Property Corp. v. Winters Nat'l Bank and Trust Co.*, 13 Ohio App.2d 190, 193, 234 N.E.2d 608, 610 (Ohio Ct.App.1967). Service upon a dissolved corporation may be accomplished "by delivering a copy to an officer, director, liquidator, or person having charge of its assets or, if no such person can be found, to the statutory agent." Ohio Rev.Code § 1701.88(C). A judgment obtained against a dissolved corporation may be enforced "against the assets in the hands of the shareholders." *North Consultants*, 1985 WL 10281 at *3; *see also Kesselring Ford, Inc. v. Cann*, 68 Ohio App.2d 131, 427 N.E.2d 785 (1980).

This court sees no reason why "dissolution" law should not be applied in the event of cancellation of a corporate charter. In the instant case, if a cause of action under CERCLA would have accrued against Acme had it not dissolved, then that cause of action may be prosecuted to judgment against the corporation. The cancellation of Acme's corporate charter by the Ohio Secretary of State and even the dissolution of the corporation consequent to "winding up" do not prevent a plaintiff with a valid cause of action against Acme from proceeding.

Thus the court concludes that all defendants are "persons" for purposes of liability under § 9607(a).

*4. Whether a release or threatened release has occurred*

■■■ Plaintiffs move for summary judgment on the issue of whether a "release or threatened release" has occurred at the facility. The court concludes that a "release" has occurred for purposes of liability under § 9607(a).

A "release" for purposes of liability under § 9607(a) is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)...." 42 U.S.C. § 9601(22). The data in the instant case show the highest concentrations of CVOCs in soil gas, soil, and groundwater in an area north of the building. Pl.App., Exh. 8, pp. 16, 17, 18, 20. CVOCs have not been detected upgradient (i.e. north and northwest) of this area. *Id.* at 20. Properties downgradient to the south and east show concentrations of CVOCs that have increased over time and greater proportions of breakdown products, rather than primary contaminants, in the groundwater. *Id.* at 18–20. Contamination is largely limited to the shallow groundwater. *Id.* at 19. The results indicate a release of CVOCs at or relatively near the surface in the area north of the building and their distribution through the groundwater. Defendants do not argue that there was no release of CVOCs. Rather each argues that it did not release the CVOCs.

Therefore the court concludes that a "release" has occurred.

### 5. Whether the release caused plaintiffs to incur response costs

Plaintiffs move for summary judgment on the issue that the release caused them to incur response costs. The court concludes that the release has not caused Bob's Beverage to incur response costs but has caused Ullman Oil to incur response costs.

Title 42 U.S.C. § 9601(25) defines "response" as "remove, removal, remedy, and remedial action" and notes that "all such terms (including the terms "removal"

and "remedial action") include enforcement activities related thereto." Title 42 U.S.C. § 9601(23) provides that "remove" or "removal" mean

the cleanup or removal of released hazardous substances from the environment, ... such actions as may be necessary to monitor, assess, and evaluate the release ... of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release....

Bob's Beverage entered into a consent order with Ohio EPA to undertake a remedial investigation and a feasibility study after Bob's Beverage reported the presence of CVOCs at the site. Pl.App., Exh. 19, pp. 8–9. Ullman Oil undertook the remedial investigation and feasibility study on behalf of Bob's Beverage. Pl.Mot., p. 17; Pl.App., Exh.'s 8, 9; Def.App., Exh. F, pp. 19–20. Bob's Beverage has not incurred any response costs resulting from the release of hazardous substances at the site. Def.App., Exh. E, p. 6. Ullman Oil has listed a variety of expenses which it claims to have incurred in connection with the remedial action at the site. Pl.App., Exh. 24. Defendants do not argue that Ullman Oil has not incurred response costs resulting from a release of hazardous substances at the facility.

The court finds that Bob's Beverage has not incurred any response costs but that Ullman Oil has incurred response costs which it would not have incurred but for the release of hazardous substances at the facility.

### 6. Whether the incurred response costs are necessary and consistent with the NCP

Plaintiffs move for summary judgment that the response costs incurred by

Ullman Oil are necessary and consistent with the NCP. There is insufficient evidence at this time to determine whether Ullman Oil's response costs are necessary and consistent with the NCP. The issue is reserved for trial.

7. *Whether all defendants are liable for contribution under § 9613(f) because they fall within a category of persons who are liable under § 9607(a)*

Plaintiffs argue that defendants Bares, Acme, Albatross, B. Merkel, and H. Merkel are liable for contribution under § 9613(f) because they fall within a category of persons who are liable under § 9607(a). Genuine issues of material fact remain to be determined in assessing the liability of all defendants.

*a. "Owner or operator"*

Title 42 U.S.C. § 9607(a)(2) provides liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." Section § 9601(20)(ii) defines "owner or operator" in the case of an onshore facility as "any person owning or operating such facility...." "This circular definition of 'owner or operator' suggests these terms have their ordinary meanings rather than any unusual or technical meaning." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1498 (11th Cir.1996); *Edward Hines Lumber Co. v. Vulcan Materials Co.*, 861 F.2d 155, 156 (7th Cir. 1988). As was noted above defendants are all "persons" for purposes of § 9607(a).

■■■■ A person may be liable as an operator of a facility at which hazardous substances were disposed of either directly, as a result of one's own actions, or

derivatively, as a result of liability imputed by law. An assessment of direct liability does not consider the relationship of the potentially liable party to the owner or other operators of the facility:

> Under the plain language of the statute, any person who operates a polluting facility is directly liable for the costs of cleaning up the pollution. See 42 U.S.C. § 9607(a)(2). This is so regardless of whether that person is the facility's owner, the owner's parent corporation or business partner, or even a saboteur who sneaks into the facility at night to discharge its poisons out of malice. If any such act of operating a corporate subsidiary's facility is done on behalf of a parent corporation, the existence of the parent-subsidiary relationship under state corporate law is simply irrelevant to the issue of direct liability.

*United States v. Bestfoods*, 524 U.S. 51, 118 S.Ct. 1876, 1886, 141 L.Ed.2d 43 (1998). A court need not "pierce the corporate veil" to find an officer or shareholder of a corporation directly liable for the disposal of hazardous wastes if that person's own acts caused the disposal. *See e.g. United States v. Northernaire Plating Co.*, 670 F.Supp. 742, 748 (W.D.Mich.1987).

■■■■ To be liable under § 9607(a) "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 118 S.Ct. at 1887. A person must affirmatively act to cause a release of hazardous waste to become an operator. *Brighton*, 153 F.3d at 315. A mere failure to act is not sufficient to create liability.[4] "After it is

---

4. Contrary to plaintiffs' contention, the Sixth Circuit has not adopted the "authority to control test," by which a person may be liable as an operator solely because the person had the authority to act to prevent the release, even though that person did not act to cause the release. *See Brighton*, 153 F.3d at 314–15.

established that a defendant is an operator, however, a defendant is just as responsible for hazardous conditions caused by its neglect and omissions as it is for those caused by its affirmative acts." *Id.*

### b. *"Disposal"*

Title 42 U.S.C. § 9601(29) provides that "disposal" in CERCLA "shall have the meaning provided in section 1004 of the Solid Waste Disposal Act" [42 U.S.C. § 6903]. That section defines "disposal" as

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

§ 6903(3).

■ A "disposal" may occur when a party disperses contaminated soil. *Redwing Carriers,* 94 F.3d at 1511; *Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342 (9th Cir.1992); *Tanglewood East Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988). Title 42 U.S.C. § 6903(3) includes the "discharge" or "placing" of waste "into or on any land or water" as a disposal. " 'Disposal' thus includes not only the initial introduction of contaminants onto a property but also the spreading of contaminants due to subsequent activity." *United States v. CDMG Realty,* 96 F.3d 706, 719 (3rd Cir.1996); *see also Kaiser Aluminum,* 976 F.2d at 1342.

■ A dispersal of contaminants need not reach some threshold level to constitute a "disposal." *United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 260 (3rd Cir.1992), *cert. denied,* 521 U.S. 1103, 117 S.Ct. 2479, 138 L.Ed.2d 988 (1997) ("[C]ourts that have addressed this issue have almost uniformly held that CERCLA liability does not depend on the existence of a threshold quantity of a hazardous substance."). "There is no exception for de minimis disturbances." *CDMG Realty,* 96 F.3d at 719.

### c. *Liability of defendants as owners or operators at the time that hazardous substances were disposed of*

### 1. *Liability of defendant Acme*

■ Plaintiffs contend that Acme is liable for response costs as an operator of the facility at the time that hazardous substances were disposed of. Acme does not contest that it was an operator of the facility, but it counters that no hazardous substances of the type at issue in the present case were disposed of at the facility during the period in which it operated the facility.

Plaintiffs allege in their motion for summary judgment that Acme used 1,1,1-trichloroethane, trichloroethene, and caustic soda at the facility. The evidence is contradictory as to whether Acme used 1,1,1-trichloroethane at the facility; Mason asserts that Acme used the compound while Bares denies it. Plaintiffs cite no evidence that Acme used trichloroethene. Even if plaintiffs could prove that Acme used both of these CVOCs in its operations, the evidence is contradictory as to whether the wash water released into the septic system or to the surface contained any CVOCs, whether barrels containing CVOCs were stored outside, whether any such barrel leaked, and whether any barrels containing CVOCs were abandoned at the site.

The evidence is incontrovertible that Acme released caustic soda, a hazardous substance, into the septic system and onto the surface while operating the facility. Plaintiffs have not alleged, however, that either caustic soda or its byproducts have been detected at the site. Because plain-

tiffs seek contribution from Acme for the recovery costs allocable to Acme's operations, proof that Acme discharged caustic soda at the site does little to advance the case which plaintiffs have made for contribution from Acme.

The issue of Acme's liability for disposal of hazardous substances detected at the site must be resolved by a factfinder, not on summary judgment.

### 2. Liability of defendant Bares

Plaintiffs contend that Bares is liable for response costs as an operator of the facility at the time that hazardous substances were disposed of and as the corporate officer of a tax-canceled corporation when wastes it abandoned migrated through the ground.

#### a. Direct liability as operator

■ Plaintiffs claim that Bares was an operator of the facility because of his personal involvement in waste management at the facility. Bares counters that he cannot be directly liable because he did not personally improperly store or dispose wastes or direct others to do so.

■ As has already been noted, to be liable under § 9607(a) "an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 118 S.Ct. at 1887. A person who affirmatively acts to cause a release of hazardous waste becomes an operator. *Brighton*, 153 F.3d at 315. Liability is strict; there is no requirement that the act resulting in a release of a hazardous waste be intentional, knowing, or even negligent. *Centerior*, 153 F.3d at 349.

■ Bares claims that "[a]bsent some egregious misdeeds, a president and sole shareholder is still entitled to invoke the protection of the corporate form." That is incorrect. A "president and sole shareholder" may be directly liable for acts which were unintentional, unknowing, and well-considered if the acts result in a release of hazardous waste. There is no "protection of the corporate form" against such direct liability.

There remain genuine issues of material fact as to whether Bares was sufficiently in control of day-to-day operations so as to have managed, directed, or conducted "operations specifically related to pollution." Plaintiffs have brought forward testimony that Bares did exercise such control; Bares denies such control. The question must be resolved by the trier of fact.

#### b. Derivative liability as corporate officer

■ Plaintiffs claim that Bares is personally liable as an officer of a corporation which incurred liability after losing its corporate charter.[5] Plaintiffs cite *Chatman v. Day*, 7 Ohio App.3d 281, 455 N.E.2d 672 (1982), for the proposition that corporate officers who fail to properly "wind up" the affairs of a corporation which has lost its charter are liable for the obligations of the corporation. This argument is not well taken.

Ohio law does not permit that Bares be held personally liable as a corporate officer in the instant case. Bares correctly notes that the instant case is distinguishable from *Chatman* on its facts; Bares did not continue to do business as a corporation after the corporation lost its charter. Plaintiffs also misstate the rule of the case in *Chatman*. The corporate officer's fail-

---

**5.** The court sees this issue as a different issue from Bares' liability which would arise under

piercing the corporate veil. See infra.

ure to "wind up" the affairs of the case was irrelevant to the outcome. The court found the officer liable because he personally conducted business under the corporate name after the corporation had lost its charter for failure to pay franchise taxes. There is no allegation that Bares did this. Moreover there is Ohio law supporting a conclusion that an officer of a corporation which incurs liability after the corporation has lost its charter for failure to pay franchise taxes should not be held individually liable for the obligations of the corporation. *See Monteith v. Kline,* 1992 WL 150281 (Ohio App. 9 Dist. June 24, 1992); *Columbia Real Estate Title Ins. Co. v. Columbia Title Agency, Inc.,* 11 Ohio App.3d 284, 286–88, 465 N.E.2d 468, 471–73 (1983).

For these reasons the court finds that Bares cannot be held liable for response costs on the theory that he was a corporate officer of a tax-canceled corporation when wastes it abandoned migrated through the ground.

### 3. Liability of defendants B. Merkel and H. Merkel

Plaintiffs contend that B. Merkel and H. Merkel are liable for response costs as owners of the facility when hazardous wastes were disposed of and as general partners in a partnership which owned the facility.

#### a. Direct liability as owners

■ Plaintiffs allege that B. Merkel and H. Merkel are directly liable under CERCLA because they were owners of a facility when hazardous wastes were disposed of.

■ Property interests and rights are defined by state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). Ohio law provides that "[a] partner is co-owner with his partners of specific partnership property holding as a tenant in partnership." Ohio Rev.

Code § 1775.24(A). Albatross owned the site from August 13, 1982 to May 1988. H. Merkel and B. Merkel were partners in Albatross. H. Merkel and B. Merkel were, therefore, co-owners of the site from August 13, 1982 to May 1988 and directly liable as owners under CERCLA for any disposal of hazardous wastes at the facility during that time.

Plaintiffs contend that Albatross and the Merkels are liable as owners because there were a series of disposals at the facility during their ownership of the site. These disposals are alleged to have consisted of discharges of CVOCs from the septic system by its design and during its upgrade, moving soil contaminated by CVOCs by excavating and grading, volatilization of CVOCs into the air, and migration of hazardous substances in the subsurface.

Plaintiffs have failed to show there are no genuine issues of material fact as to the Merkels' liability because there remain issues as to whether there were any disposals of hazardous waste during Albatross' and the Merkels' ownership of the site. As has already been noted, the evidence is contradictory as to whether the wash water which Acme released into the septic system or to the surface contained any CVOCs, whether barrels containing CVOCs were stored outside, whether any such barrel leaked, and whether any barrels containing CVOCs were abandoned at the site. While Acme did dispose of caustic soda, a hazardous substance, at the facility, plaintiffs have not alleged that either caustic soda or its byproducts have been detected at the site. When the contaminants currently in the soil and groundwater were disposed of and who owned the property when the disposal occurred are matters for the trier of fact and go to the issue of Albatross' and the Merkels' liability.

### b. Derivative liability as partners

Ohio law allows a person to be both a general and a limited partner. Ohio Rev. Code § 1782.25. Ohio Rev.Code § 1782.24(A) describes the liability of any general partner in a limited partnership: "Except as otherwise provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners."

Ohio Rev.Code § 1775.14 describes the liability of partners in a partnership without limited partners. It provides that "all partners are liable as follows: (1) Jointly and severally for everything chargeable to the partnership under sections 1775.12 and 1775.13 of the Revised Code.... (2) Jointly for all other debts and obligations of the partnership...." Ohio Rev.Code § 1775.12 declares:

> Where loss or injury is caused to any person not a partner in the partnership or any penalty is incurred, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his partners, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

■ Ohio law requires, therefore, that if Albatross incurs liability under CERCLA because of the wrongful acts or omissions of its partners, then to the extent that B. Merkel and H. Merkel were general partners in Albatross they are jointly and severally liable for debts resulting from that liability. B. Merkel and H. Merkel would be jointly liable for all other partnership debts resulting from Albatross' CERCLA liability. *See Kennecorp Mortgage Brokers, Inc. v. Huron Shores Ltd. Partnership,* 1991 WL 163494, at *4 (Ohio App. 6 Dist. Aug. 23, 1991). The dissolution of Albatross does not of itself discharge any liability which Albatross,

and hence its partners, might have incurred. *See* Ohio Rev.Code § 1775.35(A).

Plaintiffs have failed to make their case regarding the Merkels' liability because, as was noted above, there remain disputed issues of material fact as to whether there were any disposals of hazardous wastes when Albatross owned the site.

### IV. Defendants Acme and Bares' joint motion for summary judgment

Defendants Acme and Bares ask for summary judgment as to issues raised under 42 U.S.C. § 9607(a).

### A. Whether the court should "pierce the corporate veil" of Acme to find Bares indirectly liable for Acme's acts under CERCLA

■ Plaintiffs' Amended Complaint alleges that "Acme was completely dominated or controlled by Defendant Bares such that the corporation had no separate mind or existence of its own" and asks for declaratory judgment "piercing Acme, Inc.'s corporate veil and holding Bares personally strictly, jointly and severally liable...." Amended Complaint, pp. 17, 20. Bares and Acme move for summary judgment, arguing that plaintiffs have not offered evidence sufficient to allow a reasonable jury to conclude that Bares should be found liable under a "piercing the corporate veil" theory.

■ The modern theory of the corporate alter ego in Ohio was stated in *Belvedere Condominium Unit Owners' Ass'n v. R.E. Roark Co.'s, Inc.,* 67 Ohio St.3d 274, 287, 617 N.E.2d 1075, 1085 (1993). According to *Belvedere,* a court may "pierce the corporate veil" "to prevent shareholders from hiding behind the fictional entity of the corporation 'when it would be unjust.'" *Id.* In particular, "the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the

corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." 67 Ohio St.3d at 288, 617 N.E.2d at 1086 (following *Bucyrus– Erie Co. v. General Prods. Corp.*, 643 F.2d 413, 418 (6th Cir.1981)). "The burden of proof lies upon the party seeking to impose individual liability on the shareholder." *Zimmerman v. Eagle Mortgage Corp.*, 110 Ohio App.3d 762, 772, 675 N.E.2d 480, 486 (1996); *see also Ferguson v. Strader*, 94 Ohio App.3d 622, 628, 641 N.E.2d 728, 731 (1994).

The first element of this test is "a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable." *Belvedere*, 67 Ohio St.3d at 288, 617 N.E.2d at 1086. The first element was satisfied where the shareholder had "absolute, complete authority'" over the company. *Wiencek v. Atcole Co., Inc.*, 109 Ohio App.3d 240, 244, 671 N.E.2d 1339, 1342 (1996). As has already been noted, there is conflicting evidence as to the degree of control which Bares exercised over Acme's day-to-day operations.

 A shareholder exercises control over a corporation in such a manner as to satisfy the second prong of the *Belvedere* test when the shareholder exercises control "in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity...." *Wiencek*, 109 Ohio App.3d at 244, 671 N.E.2d at 1343; *see also Belvedere*, 67 Ohio St.3d at 289, 617 N.E.2d at 1086. That a single shareholder owns a corporation does not

create a reasonable inference that the corporation was formed for a fraudulent purpose. *Koch v. Lind*, 121 Ohio App.3d 43, 48–49, 698 N.E.2d 1035, 1039 (1997); *see also Ferguson*, 94 Ohio App.3d at 628, 641 N.E.2d at 731–732. Avoiding personal liability is a proper purpose for forming a corporation. *Koch*, 121 Ohio App.3d at 48–49, 698 N.E.2d at 1039. A plaintiff must show that a corporation has been used as a "cloak for fraud or illegality." *Id.* (quoting *E.S. Preston Assoc., Inc. v. Preston*, 24 Ohio St.3d 7, 11, 492 N.E.2d 441, 446 (1986)).

Plaintiffs have offered no evidence which would allow a reasonable jury to find that Bares organized Acme as a "cloak for fraud or illegality." Plaintiffs have shown that Bares was sole shareholder and that he was the president of the corporation. They have shown that he exercised some control over the day-to-day operations of the corporation, although the extent of that control is not clear. They have also shown that Bares failed to pay the required state franchise tax, resulting in the withdrawal of Acme's corporate charter. Plaintiffs have also presented some evidence that Bares' and Acme's acts may have resulted in a disposal of hazardous waste at the facility, although there is also evidence to the contrary. Plaintiffs have not offered any evidence, however, that Bares exercised control over Acme "in such a manner as to commit a fraud, illegal, or other unjust or inequitable act upon the person seeking to disregard the corporate entity...."

Because there remains a genuine issue of fact as to the scope and effect of Bares' control over Acme, this issue must be reserved for trial.

*B. Whether Acme is a viable party in this litigation*

Plaintiffs' Amended Complaint asserts liability against Acme. Defendants Acme

and Bares argue that Acme is not a viable party to this litigation because it is a "defunct corporation." Defendants' arguments are not well taken.

As has already been noted (*supra* at Ill.C.3), if a cause of action under CERCLA would have accrued against Acme had it not dissolved, then that cause of action may be prosecuted to judgment against the corporation. The cancellation of Acme's corporate charter by the Ohio Secretary of State and even the dissolution of the corporation consequent to "winding up" do nothing to prevent any plaintiff with a valid cause of action against Acme from proceeding.

Thus Acme remains a defendant in this action.

### C. Whether Bares violated Ohio Rev. Code § 1701.88(A) or § 1701.97

█ Plaintiffs' Amended Complaint contends that Bares should be held liable for debts accruing to Acme after its corporate charter was withdrawn for failure to pay franchise taxes. Plaintiffs claim that Ohio Rev.Code §§ 1701.88(A) and 1701.97 mandate such a result because "[t]he Hazardous Substances released by Acme at the Site remained in the environment and continued to migrate through the soils and groundwater after Acme's corporate charter was canceled" and "[p]laintiffs incurred response costs after Acme's corporate charter was canceled." Amended Complaint, p. 16. Defendants Acme and Bares move for summary judgment on this claim, arguing that Bares is not liable because "[p]laintiffs have admitted that they possess no evidence of any violations of Ohio Revised Code 1701.88(A) and 1701.97." Def.Mot., p. 20. The court grants defendants' motion as to this claim.

Ohio Rev.Code § 1701.88(A) provides:

When a corporation is dissolved voluntarily, when the articles of a corporation have been canceled, or when the period

of existence of the corporation specified in its articles has expired, the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, or to obtain reinstatement of the articles in accordance with section 1701.07, 1701.921, 1785.06, or 5733.22 of the Revised Code, or are permitted upon reinstatement by division (C) of section 1901.922 of the Revised Code, and for such purposes shall it continue as a corporation.

Ohio Rev.Code § 1701.97 provides:

No person shall exercise or attempt to exercise any rights, privileges, immunities, powers, franchises, or authority under the articles of a domestic corporation after such articles have been canceled or after such corporation has been dissolved or after the period of existence of the corporation specified in its articles has expired, except such acts as are incident to the winding up of the affairs of such corporation, or are required to obtain reinstatement of the articles in accordance with section 1701.07, 1701.921, 1785.06, or 5733.22 of the Revised Code, or are permitted upon reinstatement by division (C) of section 1901.922 of the Revised Code.

Plaintiffs' argument for Bares' liability is unclear. Plaintiffs apparently believe that after cancellation of Acme's articles Acme performed some act other than those permitted by Ohio Rev.Code § 1701.88(A). The only "act" which plaintiffs allege in this portion of the Amended Complaint is the migration of hazardous substances through the soils and groundwater at the facility.

█ If this is plaintiffs' argument, plaintiffs have confused federal and state law. Migration of hazardous substances through soil and groundwater, if proved, may be grounds for federal liability under CERCLA in some circumstances as a "dis-

posal" within the meaning of the Act. For example, if a party has become an "operator" within the meaning of the Act because the party affirmatively acted to cause a release of hazardous waste, then the party may also be liable for the migration of hazardous waste insofar as such migration is caused by the party's neglect or omission. *Brighton*, 153 F.3d at 315. But this is not relevant to what constitutes an "act" within the meaning of Ohio law absent some provision of Ohio law which makes it relevant. Plaintiffs have not cited any such provision, nor have they cited any Ohio law for the proposition that chemical migration in soil or groundwater after a corporation's articles have been canceled constitutes a corporate act in violation of Ohio Rev.Code § 1701.88(A).

Plaintiffs apparently cite Ohio Rev.Code § 1701.97 to prevent Bares from asserting his immunity to corporate liability as an officer and shareholder of Acme. As has already been noted (*supra* at Ill.C.7.c.2.b.), Ohio law does not permit that Bares be held personally liable in this case as an officer of a corporation which may have incurred liability after losing its corporate charter.

The court grants summary judgment to Bares on this state law claim.

### D. Whether Acme and Bares violated CERCLA as operators of the facility

■ Plaintiffs' Amended Complaint asserts that Acme and Bares have incurred direct liability as operators of a facility at a time when hazardous substances were disposed of at the facility. Defendants Acme and Bares move for summary judgment on the issue that plaintiffs have failed to bring forward sufficient evidence to allow a reasonable jury to find that Acme and Bares violated CERCLA. Defendants' arguments are not well taken.

Plaintiffs have offered evidence tending to show that Acme and Bares have incurred direct liability under CERCLA. As has already been noted (*supra* at Ill. C.7.c.1.), the evidence is incontrovertible that Acme released caustic soda, a hazardous substance, into the septic system and onto the surface while operating the facility. Plaintiffs have also offered evidence that Acme moved barrels containing solvents from its previous operational site on Chagrin Road to the site on East Washington Street in barrels in "deteriorated" condition, that these barrels were stored outside the building, that barrels containing trichloroethylene and 1,1,1–trichloroethane were placed outside the building and left to rust, that Acme washed trichloroethylene and 1,1,1–trichloroethane into the septic system, that a barrel punctured by a forklift spilled liquid at the site, that large numbers of drums were left outside after Acme ceased operations, and that a hose siphoned an unknown liquid onto the ground outside.

Plaintiffs have also advanced sufficient evidence to allow a reasonable jury to find that Bares has incurred direct liability as an operator within the meaning of CERCLA because he managed, directed, or conducted "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 118 S.Ct. at 1887. Further, there remains for trial the issue of whether plaintiffs can pierce the corporate veil.

The court overrules the motion for summary judgment of defendants Acme and Bares based on the argument that plaintiffs have failed to bring forward sufficient evidence to allow a reasonable jury to find that Acme and Bares violated CERCLA.

V. Motion for summary judgment
of defendants Albatross and
the Merkels

Defendants Albatross, H. Merkel, and B. Merkel move for summary judgment as to issues raised under 42 U.S.C. § 9607(a). The following legal issues are relevant to the motion.

A. *Whether defendants are not liable because only active conduct which causes contamination can trigger CERCLA liability for response costs*

Plaintiffs allege that defendants Albatross, H. Merkel, and B. Merkel are liable "for the response costs that they have incurred and will incur in the future pursuant to CERCLA Section 107(a) [42 U.S.C. § 9607(a) ]." Defendants argue that they are not liable for plaintiffs' response costs because only active conduct which causes contamination can trigger CERCLA liability for response costs. Defendants' argument is not well taken.

1. *Liability under § 9607(a)(1)*

a. *Liability as owners of the site as set forth in § 9607(a)(1)*

▪ Title 42 U.S.C. § 9607(a)(1) establishes liability for "the owner and operator of a facility ... from which there is a release or a threatened release which causes the incurrence of response costs, of a hazardous substance...." As has already been discussed (*supra* at Ill. C.7.c.*3.a.*), H. Merkel and B. Merkel were co-owners of the site from August 13, 1982 to May 1988 and are directly liable as owners under CERCLA for any disposal of hazardous wastes at the facility during that time.

A "release" for purposes of liability under § 9607(a) is "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant)." 42 U.S.C. § 9601(22). There is no requirement that a release be "active," intentional, knowing, or negligent. This is in keeping with the strict liability created by § 9607(a). *Centerior,* 153 F.3d at 349.

Defendants are incorrect, therefore, in their assertion that only "active" conduct which causes a contamination can trigger an owner's liability for response costs under CERCLA. If plaintiffs prove, for example, that CVOCs spilled, leaked, escaped, or leached into the environment from barrels while defendants were owners of the site, defendants would be liable for response costs. Defendants would then be required to assert one of the four defenses listed at § 9607(b) against that liability.

▪ In the instant case plaintiffs have produced sufficient evidence to allow a reasonable jury to conclude that CVOCs, a hazardous substance, leaked into the environment from barrels while defendants were owners of the site. Mason contends that barrels containing CVOCs were left outside the building in "deteriorated" condition. Cathan's testimony provides confirmation that barrels containing liquids were stored outside the building. Szoka's testimony supports the assertion that many barrels remained at the site when Albatross took ownership. Albatross and the Merkels became owners of the property on August 13, 1982, and they did not arrange for disposal of materials in the outside barrels until September 1987. A reasonable jury might conclude, therefore, that defendants are liable as owners under the requirements of 42 U.S.C. § 9607(a)(1).

b. *Liability as operators of the site as set forth in § 9607(a)(1)*

Title 42 U.S.C. § 9607(a)(1) establishes liability for operators as well as owners for

a release of a hazardous substance which causes response costs. As was noted above (*supra* at Ill.C.7.a.), a person must affirmatively act to cause a release of hazardous waste to become an operator. *Brighton,* 153 F.3d at 315. A mere failure to act is not sufficient to create liability. "After it is established that a defendant is an operator, however, a defendant is just as responsible for hazardous conditions caused by its neglect and omissions as it is for those caused by its affirmative acts." *Id.* Thus defendants are correct in their assertion that active conduct is required for operator liability under § 9607(a).

A reasonable jury might conclude that defendants are liable as operators under 42 U.S.C. § 9607(a)(1). Courts have generally found that a "release" of hazardous substances under § 9607(a)(1) is broader than, and includes, a "disposal" of hazardous substances under § 9607(a)(2). *Idylwoods Associates v. Mader Capital, Inc.,* 915 F.Supp. 1290, 1311 (W.D.N.Y. 1996), *aff'd on reconsid.,* 956 F.Supp. 410 (1997); *United States v. CDMG Realty Co.,* 875 F.Supp. 1077, 1084 (D.N.J.1995); *United States v. Petersen Sand & Gravel,* 806 F.Supp. 1346, 1351 (N.D.Ill.1992). A "disposal," as defined at 42 U.S.C. § 9601(29), includes the dispersion of any amount of contaminated soil at a facility. *See supra* at Ill.C.7.b. Plaintiffs have brought forward substantial evidence that defendants moved significant amounts of soil in or around the contaminated area at the site in the course of replacing the old septic system. Plaintiffs have also brought forward evidence that the old septic system was itself a source of contamination. A reasonable jury could conclude that defendants moved contaminated soil to areas at the site which had not yet been contaminated in the course of replacing the septic system. Such a movement would be a "disposal" within the meaning of CERCLA, and therefore would also be a "release" for purposes of § 9607(a)(1).

## 2. Liability under § 9607(a)(2)

### a. Liability as owners of the site as set forth in § 9607(a)(2)

Section 9607(a)(2) provides liability for "any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of...." Title 42 U.S.C. § 9601(29) provides that "disposal" within CERCLA "shall have the meaning provided in section 1004 of the Solid Waste Disposal Act" [42 U.S.C. § 6903]. That section defines "disposal" as

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

§ 6903(3).

There is a split of authority as to whether "passive" leaking of hazardous substances, such as the movement of contaminants through subsoil and groundwater, is a "disposal" within the meaning of § 9607(a)(2). Some courts have held that such passive "releases" are a disposal within the meaning of § 9607(a)(2). *See, e.g., Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 844–46 (4th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992). Other courts have held that a disposal within the meaning of § 9607(a)(2) does not include such passive "releases." *See, e.g., Redwing Carriers,* 875 F.Supp. at 1561 (disposal must result from an affirmative act to introduce hazardous substances into a property); *CDMG,* 875 F.Supp. at 1084 (liability can attach only after showing some active human participation in the disposal).

The Sixth Circuit has not explicitly ruled on the issue of passive disposal. The court

has held, however, that " '[d]isposal' under section 101(29), 42 U.S.C. § 9601(29), is deemed to take place only at the point at which there is a threat that hazardous wastes will be emitted into the environment, air, soil, or groundwater." *AM Int'l, Inc. v. International Forging Equip. Corp.*, 982 F.2d 989, 998 (6th Cir.1993). Under this definition contaminants which are in the soil or groundwater have already been "emitted into the environment"; their movement, without more, cannot be a "disposal." "Passive" movement of contaminants may become a disposal, however, through negligent inaction. Thus there was a disposal where

> defendants purchased the entire facility and allowed the building and its sprinkler system to deteriorate. The deterioration of the roof was found to have given rise to flooding that endangered the groundwater, and the broken sprinkler was found to give rise to the threat of fire that would endanger the air. The district court concluded that [these] events at the facility ... were entirely responsible for the "disposal" of the wastes.

*Id.*

 Defendants cannot be found liable as owners under § 9607(a)(2), therefore, merely because contaminants already in the soil moved through the subsoil or groundwater. Defendants may be held liable as owners, however, if their negligent inaction in the face of a potential release or a spread of contaminants is a cause of such a release or spread.

 A reasonable jury could conclude that defendants were liable as owners under § 9607(a)(2). Plaintiffs produced evidence tending to show that barrels in a "deteriorated" condition were left at the site and may have leaked CVOCs into the environment while defendants owned the site. A reasonable jury might find that defendants' failure to dispose properly of

the contents of those barrels from August 13, 1982 until September 1987 was negligent inaction which resulted in a release or a spread of contaminants at the site.

### b. Liability as operators of the site as set forth in § 9607(a)(2)

To be liable as an operator under § 9607(a)(2) a defendant must "manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Bestfoods*, 118 S.Ct. at 1887. Again, a person must affirmatively act to cause a release of hazardous waste to become an operator, *Brighton*, 153 F.3d at 315, but once a defendant has become an operator, "a defendant is just as responsible for hazardous conditions caused by its neglect and omissions as it is for those caused by its affirmative acts." *Id.*

 An operator is liable for "disposals" to the same extent as an owner under § 9607(a)(2). In other words, an operator is not liable merely because contaminants already in the soil moved through the subsoil or groundwater, but an operator may be liable if negligent inaction is a cause of a release or spread of contaminants.

A reasonable jury might conclude that defendants are liable as operators under 42 U.S.C § 9607(a)(2). A "disposal" includes the dispersion of any amount of contaminated soil at a facility. Plaintiffs have produced evidence sufficient to allow a reasonable jury to conclude that defendants moved contaminated soil to areas at the site which had not yet been contaminated in the course of replacing the septic system.

For the reasons given above, a reasonable jury could conclude that Albatross and the Merkels incurred liability as owners or operators under 42 U.S.C.

§ 9607(a)(1) and (2). Therefore the court overrules defendants' motion for summary judgment on the issue of whether they are liable for plaintiffs' response costs.

*B. Whether Albatross is not liable for response costs under CERCLA because Albatross did not dispose of any hazardous substance or hazardous waste*

The preceding sections · (V.A.3. and V.A.4.) show that negligent inaction which causes a release or spread of hazardous waste is a "disposal" within the meaning of CERCLA. Those sections also show that plaintiffs have produced sufficient evidence to allow a reasonable jury to conclude that Albatross was an owner and operator of the site when there was a disposal of hazardous substances at the facility. The court overrules defendants' motion for summary judgment as to Albatross' liability for response costs.

## VI. Conclusion

For the reasons given above, the court grants plaintiffs' motion for partial summary judgment in part and overrules the motion in part. Defendants' motions for summary judgment are overruled with the exception of Acme's and Bares' motion as to plaintiffs' claims under Ohio Rev.Code. §§ 1701.88(A) and 1701.97.

**IT IS SO ORDERED**